**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGE LEWIS,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

No. C 04-1834 PJH

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried before the court for a period of three days, commencing on June 6, 2005. Plaintiff George Lewis, a merchant marine, has brought an action against the defendant United States for damages incurred as a result of an accident in June 2003, which occurred while Lewis was on board the vessel USNS YANO. Lewis appeared through his counsel, Lyle Cavin Jr. and Christopher Goodroe, and the United States appeared through its counsel, Eric Danoff.

## FINDINGS OF FACT

The court has attempted to "avoid commingling findings of fact with conclusions of law." Lieber v. Macy's West, Inc., 80 F. Supp. 2d 1065, 1066 n.1 (N.D. Cal. 1999). To the extent this effort fails, "any conclusions that are inadvertently labeled as findings (or vice versa) shall be considered 'in [their] true light, regardless of the label that the . . . court may have placed on [them].'" Id., quoting Tri-Tron International v. Velto, 525 F.2d 432, 435-36 (9th Cir. 1975).

    A.    George Lewis

George Lewis is a 58-year-old merchant marine who now lives in Oakland, California. Lewis grew up in Alabama, where he only completed the seventh grade before leaving school to work full-time on his family's farm. Lewis is functionally illiterate. He is able to sign his name and recognize his name on documents, but is not able to read or write anything beyond that.

1  Lewis left home when he was 18 and moved to New Orleans. He became a merchant
2  marine in 1967 and worked through the National Maritime Union until 2002. In 2003, Lewis
3  joined a new union, the Sailors' Union of the Pacific. It was through this union that Lewis was
4  assigned to work on the USNS YANO, in the capacity of an able-bodied seaman.

Before Lewis joined the YANO, he had already been diagnosed with a number of
medical conditions, including hypertension and diabetes. He had previously broken his right
orbital bone (eye socket) some time before 2003. Lewis was unable to provide any
information about this injury at trial, but affirmed that he did not injure his right eye while on the
YANO.[1]

Additionally, in November 2002, Lewis was diagnosed with hepatitis C and was told to
abstain from drinking alcohol in the future. Def. Exh. A-27.

B.    June 20, 2003 Accident

The YANO was being used to transport military cargo by sea from the east coast of the
United States to Kuwait and back. The schedule for the YANO indicates that it was docked in
Newport News, Virginia from June 15 to June 29, 2003, when it set sail for the Middle East.
Def. Exh. A-3.

On June 20, 2003, Lewis reported to work at 8 a.m.[2] Bosun Jeff Tweedy assigned
Lewis and ordinary seaman Kenneth Thueringer to clean up oil in the forward machine space
of the ship.[3] Tweedy Depo. at 16:22-20:20.

The forward machine space contains machinery that uses pressurized hydraulic fluid to

---

[1]  Lewis stated at trial that he had never suffered any previous head injuries before setting sail with the YANO.

[2]  Lewis testified that the YANO was already at sea this day.

[3]  The chain of command on a ship is as follows: The captain delegates to the chief mate, who delegates to the second and third mate, who delegate day-to-day duties on board the ship to the bosun. The bosun is supported by the able-bodied seamen and the ordinary seamen, with the able bodied seaman superior in rank to the ordinary seaman. On the YANO, the relevant crew members were: captain Frank Reed, chief mate Anthony "Dru" DiMattia as the chief mate, third mate Matthew Tanner, bosun Tweedy, able-bodied seaman Lewis, and ordinary seaman Kenneth Thueringer. Because all of these witnesses except for plaintiff, were at sea during the time of trial, their testimony was submitted through depositions.

power machinery on the deck, and as a result, oil from the machinery will leak. For this reason, the forward machine space is designed with a raised metal lip on the floor a few inches high and surrounding the machinery, to catch the oil and confine it to one area. The area inside the metal lip is called the "containment space." The space is about the height of a man's calf, and allows about four inches of space in which to work. See Def. Exh. A-10 (pictures of forward machine space and containment space). The space is also equipped with both natural and mechanical ventilation. See Def. Exh. A-10 at 13 (picture of ventilation), DiMattia Depo. at 85:17-86:14, 160:2-162:13; Reed Depo. at 20:17-25:24.

When docked, the YANO listed to starboard (right). DiMattia Depo. at 144:18-145:6. Thus, the oil in the containment space was deeper on the starboard side than on the port side (left). Lewis testified that the oil was very deep. Crewmembers testified that the shallow side of the spill (taking up about half of the containment area) had only a sheen of oil, and the deeper side had about an inch or two of oil at most. Thueringer Depo. at 16:17-18:4; Tweedy Depo. at 21:4-9 (describing half an inch of oil at the most). See also DiMattia Depo. at 145:11-149:3 (describing at most about 2 inches of oil at the deep end, and a sheen on the other); Reed Depo. at 30:6-31:3 (noting that oil deeper than 2 inches would have spilled out of the containment space). Tweedy told Lewis and Thueringer to clean the oil using absorbent pads, known as diapers. This is a standard method of cleaning oil in forward machine spaces, and is a routine deckhand assignment. Tweedy Depo. at 22:9-23:24.

While spills on deck are cleaned with sawdust, sawdust is generally not used in the closed forward machine space because the dust can interfere with the machinery's functioning. Tweedy Depo. at 26:2-27:10, DiMattia Depo. at 79:19-80:10, 149:18-150:3. A wet/dry vacuum similarly cannot be used because the vacuum does not work for oil. DiMattia Depo. at 78:8-15. Ordinarily, the deckhand places the diapers, which are about 19 inches long and 15 inches wide, onto the spill; allows the pad to absorb the oil; and then discards the pad. This is repeated until only a small amount of oil is left, at which point the deckhand uses a rag to wipe away the remaining oil. Tweedy Depo. at 24:19-25:12. If Lewis or Thueringer

3

felt that using the diapers was unreasonable or ineffective, they were free to obtain any equipment they felt necessary to use from the supply closet. See, e.g., Thueringer Depo. at 21:21-22:6 (noting that Lewis did not express a need for sawdust that day).

Lewis and Thueringer started working around 10:20 a.m. However, each testified very differently about the events and circumstances of their assignment.

According to Lewis, in order to reach the oil in the back of the containment area, he was required to step into the containment area. He put down a diaper and stood on it to reach the oil in the back. As he was reaching back, Lewis testified and physically demonstrated in court that his right foot slid out from under him and as he fell, he hit his head on a pipe. However, Lewis then testified that he hit his head on the pipe as he was raising his head up from a crouching position when his hand slipped. He continued to testify as to both versions of the events interchangeably throughout the trial. The documentation similarly reflects both versions. Compare, e.g., Pl. Exh. 4 (incident report of 7/15/03, reporting that accident occurred when Lewis' hand slipped and he raised his head) with, e.g., Pl. Exh. 9 (Lewis reporting to defendant's expert Goldstein in 2004 that his leg slipped and he hit his head while falling). At trial, Lewis testified that he felt dizzy or lightheaded at the time of the accident.[4]

Lewis also testified that a short time later, he hit his head a second time almost in the same spot, as he was working underneath a tabletop. Lewis testified that he was wearing a hard hat, but it fell off right before he hit his head, both times. Lewis claimed at trial that he

---

[4] The YANO's records indicate that Lewis did not complain of dizziness at the time of the accident. See, e.g., Def. Exh. A-7 (report of 7/15/03). The first time Lewis reports this dizziness was in response to directed questioning on the topic by his expert, Captain Mitchell Stoller, as reported in his report of March 16, 2005, almost two years after the accident. Pl. Exh. 28. Recognizing that the record does not support a finding that plaintiff complained of dizziness immediately or shortly after the accident, plaintiff urges in his post-trial proposed findings of fact and conclusions of law, at ¶ 88, "In light of the beneficent purposes of the Jones Act and general maritime law, and in line with the law's instruction to treat seamen as Wards of the Court, the court finds that Plaintiff did complain of dizziness as well as headaches while on the vessel."

4

1 had hit his head quite hard, but that he did not lose consciousness either time.[5] Lewis also
2 testified that he was alone at the time both accidents happened, because Tweedy and
3 Thueringer had left the space to get equipment. Lewis also testified that after the accident
4 occurred, he stopped working.

5 Thueringer testified differently as to the events of that morning. Thueringer testified that
6 he never left the forward space that morning, and was working with Lewis at all times.
7 Thueringer also testified that while oil generally has an odor, he did not feel any effects from
8 inhaling any oil fumes that morning. He testified that Lewis was not wearing a hard hat. While
9 he did not witness the accident, Thueringer recalled that at some point that morning, Lewis
10 said he hit his head on a pipe, and that he had a "higgin," or bump, on his head as a result.
11 Thueringer reported that Lewis did not appear to be in great pain or distress beyond rubbing
12 his head, was not bleeding, did not have a seizure, did not lose consciousness at any time,
13 and continued working in the containment area without further incident. Thueringer also
14 reported that they finished the job around 11:30 a.m. Lewis did not mention a second
15 accident to him or any bumps involving a table. Thueringer Depo. at 22:25-26:19, 32:22-34:6,
16 36:12-37:8.

17 Lewis did not report the injury to DiMattia, the ship's medical officer for the month of
18 June, see Def. Exh. A-4 (ship medical log, showing no report of injury on 6/20/03), or to his
19 supervisor Tweedy, Tweedy Depo. at 28:21-25 (no report of injury from incident). Lewis
20 continued to work for the rest of the day without incident.

21 C. Post-Accident

22 On June 26, Lewis casually mentioned to Tweedy that he had bumped his head a few
23 days earlier, but that he was not injured. Tweedy Depo. at 29:1-30:8. Tweedy reported this to
24 third mate Tanner, who would be acting as the ship's chief medical officer for the month of

---

[5] The reports of plaintiff's experts reflect that Lewis reported to them that he had been knocked unconscious at the time of the accident. See, e.g.,. Pl. Exh. 9 at 2 (plaintiff expert Goldstein report, Lewis reporting he was unconscious for 20 minutes); Pl. Exh. 20 at 1 (plaintiff expert Gravina report, Lewis reporting he was unconscious for 5 minutes).

5

1  July.  Tanner then asked Lewis if he was all right.  Tanner Depo. at 66:23-68:7.  Since the ship
2  was still docked at Newport News at this time, it would have been possible for Lewis to see a
3  doctor immediately if there was a problem.  Lewis, however, said he was fine.  Id., see also,
4  e.g., Tanner Depo. at 69:4-8.  Therefore, no medical report was logged and no medical
5  referral was made.  Def. Exh. A-4.

6        On July 9, 2003, about three weeks after the accident occurred and after the YANO had
7  left port and set sail for Kuwait, Lewis reported to Tanner, who was the medical officer for that
8  month, that his head hurt.  Lewis stated that this was an injury he had incurred before boarding
9  the YANO.  DiMattia Depo. at 56:17-20.  Tanner and DiMattia then visually inspected Lewis'
10 head and found no bumps or swelling.  DiMattia Depo. at 118:8-119:15 (neither Tanner nor
11 DiMattia noticed bumps or swelling on Lewis' head), 167:21-168:13.  Nonetheless, because
12 neither Tanner nor DiMattia are medical doctors, they called a shoreside doctor, who
13 recommended that Lewis use ice packs on the injury and take ibuprofen for the discomfort.
14 Def. Exh. A-5; see also Reed Depo. at 11:10-13:5 (captain inspected Lewis and ordered
15 Tanner to call shoreside doctors MHS).  At that time, Lewis denied feeling any dizziness,
16 nausea, or confusion.  Def. Exh. A-6; see also Tanner Depo. at 20:20-21:17, 76:18-77:12;
17 82:3-23.  Tanner and DiMattia were specifically told by the shoreside doctor to observe Lewis
18 carefully to see if he seemed dizzy or confused.  Id.; see also Def. Exh. A-4 (medical log).
19 They followed these orders, and Lewis appeared to be fine.

20       At no time following the accident did anyone report seeing Lewis in any apparent
21 distress.  Lewis never reported any injuries or discomfort and worked diligently while on
22 board.  See, e.g., DiMattia Depo. at 61:1-8 (Lewis reporting to DiMattia that injury would not
23 impair Lewis' ability to work), 105:1-4, 134:3-20 (Lewis worked voluntary overtime in addition
24 to completing his regular duties); Tweedy Depo. at 30:21-34:16, 35:24-36:15, 36:16-37:22.  In
25 addition, Tanner and Lewis were assigned to the 12 to 4 watch on the ship, which requires
26 that two sailors stand on deck from 12 noon to 4 p.m. and 12 midnight to 4 a.m., and thus
27 spent eight hours a day together every day while at sea.  Tanner reported that Lewis stood all
28

his watches during this time, always seemed fine, and that Lewis never reported any injuries or discomfort to him. Tanner Depo. at 50:9-17, 77:21-79:2, 84:5-85:5; Reed Depo. at 13:15-24 (noting that Tanner was in best position to check on Lewis during the watches).

Throughout the voyage, Lewis continued to perform all his assigned duties and appeared fine to all observers. See also DiMattia Depo. at 169:19-172:11; Reed Depo. at 79:1-81:5 (noting that if Lewis had appeared dizzy at any time, he would not have been permitted to steer, but that Lewis was an excellent helmsman while serving on the YANO.). However, Lewis testified at trial that he was experiencing dizzy spells and headaches throughout this time.

On July 26, 2003, the YANO docked in Ashuaybah, Kuwait, and Lewis was sent to see a shoreside doctor. The shoreside doctor recommended that Lewis be given one day off to rest, and prescribed Tylenol. Lewis took the day off and then worked all his shifts for the rest of the voyage without further incident. Tanner Depo. at 77:21-79:2 (Lewis stood all watches except for the day off in Kuwait).

On the return voyage from Kuwait, the YANO docked in Crete and Amsterdam. Lewis claims that he requested to see shoreside doctors or be sent home early from those ports, but that his supervisors refused. Other crewmembers claim that no such requests were made. See, e.g., Tanner Depo. at 36:13-16, 82:24-84:2.

The YANO returned to the United States and docked in Savannah on September 4, 2003. Lewis requested to see a doctor in Savannah. The doctor in Savannah found Lewis unfit for duty, and sent Lewis home to Virginia.

D.  Post-YANO

After returning to Virginia, Lewis began seeing a number of doctors for a variety of medical complaints. On September 12, 2003, Lewis went for a follow-up checkup concerning the YANO accident. At that time, he reported that he had lost consciousness at the time of the accident, and that he had a brain tumor. He did not report any seizures, and also did not report his preexisting conditions of hypertension, diabetes, or hepatitis C. Def. Exh. 28 at 1-2.

On October 31, 2003, he returned to the ER, reporting that he had a brain tumor. At that time, he reported that on June 20, 2003, he hit his head on a metal table, fell unconscious, and had a seizure, "which he has never had before or since." He reported his hypertension but not his diabetes or hepatitis C. Def. Exh. 28 at 4-5.

On the morning of December 15, 2003, Lewis drank anywhere from two to five beers. The record is unclear as to where Lewis drank these beers. At his deposition, Lewis had testified that he drank two beers at home and then three at a bar later that day, but at trial, Lewis denied going to the bar and stated instead that he had drunk three beers at home, after which he was walking to a convenience store when his knees began to weaken before he lost consciousness. When confronted with this inconsistency, Lewis had no response.

What is undisputed is that Lewis was found passed out in front of a local bar, having hit his head when he fell. He testified that he had no warning of the event and did not mention feeling dizzy before he lost consciousness. Lewis was found foaming at the mouth and moving lethargically, and was rushed to the emergency room. See, e.g., Def. Exh. A-28 at 7 (ER report). At the ER, he reported that he had fractured his skull in the accident on the YANO, but that it had healed. When reporting his preexisting medical conditions, he reported his hypertension and diabetes but not his hepatitis C. He was diagnosed as having suffered a seizure. Def. Exh. A-28 at 7-9.

The next day, Lewis told the doctors that he had previously had a seizure in October 2003, of which he remembered no details, and that he had felt dizzy before passing out the day before. Id. at 10. However, he told another doctor that he had never had any previous seizures, but also that he had experienced three previous episodes of "passing out." The doctors also noted that bystanders did not report any seizure-like activity when Lewis passed out at the bar the other day. Id. at 11. Lewis reported drinking 3-4 beers a day, but did not report his hepatitis C.[6] Lewis was diagnosed with intracranial bleeding, which was expected

---

[6] This medical report also states that Lewis claimed to be a widower, which has never been mentioned before or since. Id. at 11-13. At trial, Lewis testified that he had never been married.

8

1    to resolve without incident.

2    After this incident, Lewis returned to the hospital about a week later, reporting painful
3    headaches and asking to stay in the hospital "until this all resolves." Def. Exh. A-28 at 15
4    (12/21/03 visit). A few weeks later, Lewis returned to the emergency room, reporting that he
5    was repeatedly passing out and in constant pain with a headache. Id. at 18 (1/14/04 visit, also
6    finding that "he smells somewhat of alcohol but denies drinking").

7    During this time, Lewis underwent a number of MRIs to determine whether he had
8    suffered any brain trauma, all of which came back normal. See, e.g., Pl. Exh. 9 at 5
9    (independent medical expert Goldstein report, summarizing history of MRIs); Def. Exh. A18
10   (def. medical expert Barakos, same); Goldberg Depo. at 9:16-10:13 (plaintiff expert,
11   summarizing MRIs from 2003).

12   Some time after this, Lewis moved to Oakland. On May 13, 2004, Lewis arrived at the
13   ER reporting another seizure incident. Lewis now reports that he has a persistent headache
14   and blacks out intermittently, and as a result, he is now completely unable to work. Lewis has
15   since been diagnosed with persistent seizure disorder. His doctor, Richard Gravina, testified
16   that he does not believe that Lewis is likely to improve.

17   The YANO paid Lewis $16/day (standard contract rate) in maintenance and cure
18   payments for his medical expenses from September 5, 2003 to July 7, 2004. Def. Exh. A14.
19   Based on Dr. Goldstein's independent medical examination, see Def. Exh. A22, the YANO
20   determined that as of July 7, 2004, Lewis had reached the point of maximum medical
21   improvement for his headaches and stopped payments.

22   Lewis claims that his headaches, dizziness and seizures were all caused by the
23   accident on the YANO and requests damages from the United States.

24   E.   Credibility

25   As is apparent, Lewis' version of the events on the YANO stands in stark contrast with
26   almost every other crewmember's testimony, and in places also contradicts itself. For the
27   reasons that follow, the court concludes that Lewis' testimony is not reliable.

28

The court does not believe that Lewis intentionally attempted to deceive the court in presenting his testimony. Lewis appears to be a modest hard-working man, who has worked for everything that he has, and who has not been the recipient of many, if any, handouts. However, the record reflects numerous examples of Lewis omitting elements of his medical history and misstating his personal history and basic facts. Lewis' trial testimony amply demonstrated his poor recall and his profound difficulties in articulating coherent responses even to relatively-straightforward direct questioning. See also, e.g., Goldstein Depo. 19:11-12 (describing Lewis as "sincere," but an "unreliable historian").

The internal inconsistencies in Lewis' testimony make it impossible to reconcile certain versions of Lewis' testimony with other versions, rendering much of the testimony unbelievable. For instance, in one version of events, Lewis claims that while working in about 4 inches of space in the forward machine space, he hit his head hard enough to fracture his skull, recovered, and then hit his head again a few minutes later.

Moreover, Lewis was unable to give a coherent account of the accident itself, at times claiming that he slipped and fell downward, and at others claiming that he hit his head while raising it up. The court notes that if Lewis had in fact slipped downward as he demonstrated in the courtroom, the resultant bump should have been to the front of his head or forehead, and if he had hit his head while raising his head up, as he described the second accident, he should have hit the back of his head. The medical records show and Lewis testified however, that the injury was to the side of his head. No explanation can be found in the record that would explain this seeming inconsistency.

Additionally, Lewis seemed somewhat impressionable and suggestible, answering questions the way he believed the questioner would want him to, which rendered his testimony particularly vulnerable to tainting through leading questions. For example, the first time Lewis indicated that he may have felt dizzy at the time of the June 20 accident was when he was specifically asked many months after the accident by one of his experts, if he had felt dizzy at the time of the accident. This further undermines the reliability of Lewis' testimony.

The court therefore credits the testimony of the other sailors as more accurately describing the circumstances on June 20, 2003, and finds that Lewis somehow suffered a hard bump to the head, enough to cause pain, headache and bruising, but not enough to cause dizziness, seizures or permanent damage. The court also finds that any head pain that Lewis may have suffered after the accident was not sufficiently severe to have affected his work on the YANO in any way.

## CONCLUSIONS OF LAW

A.  Legal Standards

Lewis sues both for unseaworthiness and for negligence under the Jones Act. Both causes of action are premised on a finding that the YANO was not reasonably fit to set sail and that Lewis' injuries were caused by the YANO's negligence or unseaworthiness.

1.  Unseaworthiness

The United States as a shipowner has an absolute duty to provide a seaworthy ship, which is a ship that is reasonably fit for its intended use. Ribitzki v. Canmar Reading & Bates Ltd. P'ship, 111 F.3d 658, 664 (9th Cir. 1997). To prevail on this claim, Lewis must show that 1) the ship's warranty of seaworthiness applied to him; 2) he was injured by the ship's equipment; 3) the equipment was not reasonably fit for its intended use; and 4) this unseaworthy condition caused Lewis' injury. Id.

2.  Negligence

Lewis also sues the United States for negligence under the Jones Act, 47 U.S.C. § 688. Under the Jones Act, Lewis must show that the United States "was negligent, and the negligence was a cause, however slight, of his injuries." Ribitzki, 111 F.3d at 662 (noting that "even the slightest negligence is sufficient to sustain a finding of liability," and citing Havens v. F/T Polar Mist, 996 F.2d 215, 218 (9th Cir. 1988)). To show negligence, Lewis must demonstrate that the United States had a duty to provide him a safe place to work, breached that duty, knew or should have known about the work conditions, and that the United States' negligence caused Lewis' injury. Ribitzki, 111 F.3d at 663-64.

11

### 3. Maintenance and Cure

Lewis also requests maintenance and cure. "Maintenance and cure is the obligation of a shipowner to care for a seaman injured during the course of maritime employment." Kopczynski v. The Jacqueline, 742 F.2d 555, 559 (9th Cir. 1984) (citations omitted). The ship is only obliged to pay maintenance and cure until the sailor reaches the point of "maximum cure," where the sailor will not improve any further. Farrell v. United States, 336 U.S. 511, 518 (1949). All ambiguities concerning liability are to be resolved in favor of the seaman. Vaughan v. N.J. Atkinson, 369 U.S. 527, 532 (1962).

## B. YANO's Negligence

As discussed above, the court cannot credit any of Lewis' trial testimony concerning his alleged head injury. Since the accident, Lewis has related so many different versions of the events of June 20, 2003, that it is impossible for the court to determine exactly what happened in the forward machine space to cause Lewis to bump his head, or if conditions on the YANO factored into the injury in any way. In other words, the court believes that Lewis bumped his head on June 20, 2003, while on the YANO. However, the circumstances which produced this accident are less than clear, and it is impossible to conclude that it was caused by something the government did or that it was not caused by something Lewis did. Thus, the court cannot find that the YANO bears any responsibility for Lewis' injury.

## C. Conditions in the Forward Machine Space

However, even assuming that the conditions in the forward machine space caused Lewis to bump his head, Lewis fails to demonstrate unseaworthiness or negligence based on the buildup of oil in the forward machine space, or on the YANO's request for Lewis to clean up the oil.

### 1. Oil Spill

To find that the YANO was unseaworthy, Lewis must show that it was unreasonable for the YANO to have allowed dripping oil to build up in the containment area and to have asked Lewis to clean it up. Given the nature of sailors' work, it is not reasonable to demand a

12

completely unslippery work environment, but a sailor is nonetheless entitled to a work space that is not unreasonably slippery for the job the sailor is asked to do. See Ribitzki, 111 F.3d at 663, 665 (citing cases). However, this is not a situation where the sailor is asked to perform his duties in an environment that happens to be slippery. Rather, here the sailors were specifically ordered to clean up spilled oil.

Under these circumstances, the court cannot find that the forward space was unreasonably slippery for the job Lewis was assigned to do, or that it was unreasonable for Lewis to be assigned the task of cleaning the oil. The government provided extensive testimony that oil routinely drips from the machinery in the forward space in the normal course of ship use and maintenance. See, e.g., Tweedy Depo. at 21:10-24; Reed Depo. at 24:20-22, 27:7-9, 52:2-7; DiMattia 90:15-91:4, 156:13-157:4. In fact, the containment area bordered by the metal lip on the floor, was specifically designed to catch and contain dripping oil. Lewis thus cannot establish unseaworthiness on this basis.

In addition, because of the list of the ship, the oil had only accumulated to about two inches at its deepest end. As many of the crewmembers reported, the shallow end of the oil pool was merely an oil slick on the surface. Thueringer Depo. at 16:17-18:4, 20:1-9 (normal amount of oil in the containment area); Tweedy Depo. at 21:4-9; DiMattia Depo. at 145:11-149:3). The court credits the crewmembers' testimony as more accurate than Lewis', and thus finds that the YANO crew did not unreasonably delay in cleaning the oil, as there is no evidence that the amount of oil within the containment area was excessive.

Similarly, the YANO did not act unreasonably in asking Lewis to clean the containment area. The containment area is designed to catch oil, which is slippery by its very nature. It is not unreasonable for an area which is specifically designed to catch oil to be slippery, and thus Lewis' work space cannot be considered unreasonably slippery for the task he was assigned to do: namely, cleaning up oil.

    2.    Oil Spill Cleanup

Lewis also claims the ship was unseaworthy because he was not given proper

direction on how to clean the oil spill, he was not provided with a proper and safe method for cleaning the oil, and he was not provided with proper and adequate tools for the job.

There is no evidence in the record supporting any of these arguments. The crewmembers describe the task of cleaning the containment area of the forward machine space as an extremely routine job. See, e.g., Tweedy Depo. at 22:9-23:24; DiMattia Depo. at 139:15-17; Thueringer Depo. 13:14-24, 19:15-25. Lewis had almost forty years experience as a merchant marine, and had worked as an able-bodied seaman for much of that time. The YANO did not act unreasonably in assuming that Lewis would be able to clean the oil spill without extensive instruction.

Similarly, there is no evidence that Lewis was not provided with a safe method for cleaning oil or not provided with adequate tools to do so. The government presented extensive evidence that using rags and diapers was a safe, effective, and adequate method for cleaning up oil in the containment area. See, e.g., Tweedy Depo. at 38:10-39:14; Thueringer Depo. at 26:20-27:5. The government also presented evidence that other methods of cleaning spills, such as those suggested by Lewis – sawdust or a wet/dry vacuum – would not be as effective in the forward machine space. Tweedy Depo. at 26:2-27:10, DiMattia Depo. at 78:8-15, 79:19-80:10, 149:18-150:3. The court finds this evidence persuasive, and concludes that the YANO cannot be found unseaworthy on this basis.

        3.      Ventilation

Finally, Lewis argues that the YANO was unsafe or unseaworthy because the inadequate ventilation of the toxic oil fumes in the forward machine space caused him to become dizzy, which resulted in the accident. However, the only evidence that Lewis felt dizzy before he fell on June 20, 2003, was Lewis' own statement made in response to questions from his own expert in preparation for trial, many months after the accident. See Pl. Exh. 28 (Stoller expert report). Lewis never mentioned that he had felt dizzy before he slipped to his crewmembers or to any medical personnel. The government additionally presented evidence that the forward space was well-ventilated, that Thueringer did not recall any unusual odors or

14

dizziness on Lewis' part that day, and that the oil at issue is not considered toxic, see Def. Exh. A-30. The court has already found that it cannot credit Lewis' testimony that he felt dizzy before the accident occurred, and given the evidence presented by the government, the court finds that Lewis has not shown that the YANO was unsafe or unseaworthy for lack of ventilation.

### D.   Lack of Damages

Finally, even if the court were to find negligence or unseaworthiness were the cause of Lewis' fall, his claims would still fail because he is unable to establish damages caused by the fall.

Doctors Goldstein and Gravina both agree that if Lewis had suffered a sufficiently-traumatic injury to trigger permanent damage, he would have begun feeling headaches or dizziness within two to three days of the injury. See also Goldberg Depo. at 46:21-47:12. While Lewis complains of headaches in this time period, he specifically denied feeling dizzy. See Def. Exh. A-6; see also Tanner Depo. at 20:20-21:17, 76:18-77:12; 82:3-23. This supports a conclusion that Lewis was not permanently injured on June 20, 2003.

In fact, Lewis did not even report the injury to his supervisors until about three weeks later, and did not feel sufficiently unwell that he could not work or request overtime in that time period. His coworkers also note that in this period of time, he appeared in no distress and worked without incident. So any symptoms Lewis felt were obviously not disabling. See, e.g., DiMattia Depo. at 61:1-8, 105:1-4, 134:3-20, 169:19-172:11; Tweedy Depo. at 30:21-34:16, 35:24-36:15, 36:16-37:22; Tanner Depo. at 50:9-17, 77:21-79:2, 84:5-85:5; Reed Depo. at 79:1-81:5.

Thus, even if Lewis had shown that the YANO had negligently caused the accident (which he has not), Lewis also has not shown that the June 20, 2003 accident caused him any damage, let alone rendered him completely unable to work for the remainder of his working life. The court thus finds that the YANO and the United States bear no responsibility for Lewis'

1 current medical condition(s).[7]

   E.   Maintenance and Cure

The only evidence in the record that Lewis did not reach maximum cure as of Goldstein's July 6, 2004 independent medical examination, see Def. Exh. A22, are Gravina's rebuttal reports of February 2005, in which he opines that Lewis might show improvement when he begins taking the proper level of medicine. Pl. Exh. 20. This supports a conclusion not that Lewis' medical condition was likely to improve, but rather, that Lewis' condition was exacerbated because he was not receiving or taking sufficient medicine. However, a finding of maximum cure is reached when the plaintiff's physical incapacity is permanent, see Vella v. Ford Motor Co., 421 U.S. 1, 5 (1975), and as a policy matter, cannot be defeated by a failure to comply with medical orders.

By contrast, at trial, Goldstein testified that in his opinion, Lewis' condition was "permanent and stable," meaning that further improvement was unlikely. This more accurately describes the nature of the maximum cure inquiry. Since Gravina conceded that nothing had changed in Lewis' medical history since the summer of 2004, the court thus credits Goldstein's finding that Lewis had reached maximum cure as of July 6, 2004, and finds that the government's obligation to provide maintenance and cure is fully discharged.

Judgment is entered in favor of the defendant. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 16, 2005

_____
PHYLLIS J. HAMILTON
United States District Judge

---

[7] Furthermore, because many of the medical diagnoses presented at trial are based on Lewis' incorrect reporting of his own medical condition and history, the court is uncertain how accurate or reliable those reports actually are.